Last case, 800 River Road, NLRB. Good morning, Your Honor, and may it please the Court, Aaron Murphy, on behalf of the Petitioner-Woodcrest Health Care Center, and I'd like to reserve three minutes of time  It's granted. There are two basic problems with the NLRB order that we're challenging here. The first one is that the Board failed to abide by the settled rule that a decision to grant or withhold benefits during a union election is unlawful only if undertaken for the impermissible purpose of trying to influence the upcoming election. And the second... Was there any finding at any point in time by the ALJ or the NLRB regarding intent or purpose? There is no finding that I find on this record, Your Honor. There's really no discussion whatsoever of motive, and I don't think there's any evidence from which an improper motive could be found on this record either. I mean, essentially, it looks like the NLRB took the safe harbor and made it a test, but that isn't the first time that that is repeated in the NLRB jurisprudence, if you will. It's not the first time they've referenced the safe harbor. I think there's a number of problems with the safe harbor. Well, why didn't you avail yourself of the safe harbor? I mean, it has been a vexing question to me why, given its existence, its long-term existence, your client would say now and has said that it was confronted with a dilemma when the apparent reason would be that they weren't given very good legal advice, and you did not represent the party at that stage. I understand that. I did not, but I don't think that's the problem here. It's inexplicable to me. Actually, I think there's a ready explanation, which is the safe harbor itself is inconsistent with the law here because it forces employers to make a promise to their employees that the NLRA may prevent them from keeping, and I would point you specifically to this Court's decision in EGLE Materials, which holds that unilaterally granting benefits after the election is itself potentially unlawful for one of two reasons, one being because if there are objections to the election, there might be another election, so you still have an exchange cards problem, and the other one being if the union wins the election, the employer is obligated to bargain with the union. Whether their benefits increases or decreases, the employer can no longer unilaterally change an employee's benefits after the union represents the employee. I'm sorry, are you making, you have a passing reference to compelled speech. Are you objecting on compelled speech grounds? Certainly, that's part of the problem here. I think even without the compelled speech problem, there's a problem that this is inconsistent with the Act. But forcing an employer to give a message that is inconsistent with the Act has legal problems and constitutional problems, and it ultimately puts them in a position where they're seriously undermining their credibility with the employees by making this promise that isn't really a true promise, but instead it's just this script that the Board is forcing them to give. Can we step back and look at whether we owe deference and what kind of deference we owe to the Board's construction here? Because you're relying on our case law and on exchange cards for this idea of a requirement of a purpose. But Brown-Dex tells us that even if there's inconsistent judicial decisions, that we will defer to the agency's interpretation unless the judicial decisions are based on the idea that the statute on its face is unambiguous. So is it your position that as to both 83 and 81, that the statute is unambiguous in the sense of an anti-union motive by the employer? Yes, and if I can elaborate, for purposes of 8A3, I think this question is pretty clear because it's on the face of the statute. It only prohibits discrimination for the purpose of discrimination to discourage or encourage union membership. And the Supreme Court, in looking at that language 60 years ago, actually used the words this statute is unambiguous, and then explained what it was unambiguous about is what kind of discrimination it prohibits. How do we take it to an 81 violation? It's not as clear on the face, but I would submit that the Supreme Court has made that equally clear in the Brown decision. And what they said in that decision is, there may be instances where there is conduct that is so inherently destructive of rights that no matter what the circumstances, it always violates the law. But beyond that, you need motive. Now this is not one of those circumstances because the board itself has long taken the to present evidence because, of course, employers grant and withhold benefits in the regular course of business. But we don't, even if we accept your argument, we don't need to decide that ourselves as to whether this is so inherently destructive. Wouldn't we remand to the board for them to apply the proper standard? I think that the appropriate thing here to do is apply the standard that has always been applied, which is you need motive, and look at this record here and say the board didn't find it. But we don't have the facts. We don't have the facts regarding motive, intent, and purpose because the ALJ never looked at it. It bought the safe harbor as being the sine qua non. So wouldn't it have to go back actually probably to the ALJ for findings regarding intent and purpose? I don't think it would because it is the obligation of the board. They bear the burden of proof here, and they should have made a record on this issue because it's part of their burden of proof. So I would say if you take a look, for instance, at the Ninth Circuit's three-floor packaging case, it's a similar case. And what the court said there was that the board improperly believed it could just infer motive where motive was – where doing so was irrational under the circumstances, and therefore it refused to enforce the order because there was no evidence, let alone substantial evidence, that there was an improper motive. But even if we agree with you that – assume that there is a requirement of purpose, the Supreme Court in our cases also acknowledged that you can't have a presumption. In fact, the very sort of burden shifting that the Supreme Court has instructed suggests that the burden is shifting to the employer to put forward some explanation, but there may be situations where the conduct is so inherently destructive of employee rights that even that explanation will not be sufficient. Why isn't it the case that the board here has simply made a determination that selectively granting or denying benefits is in that category of inherently destructive conduct that warrants this presumption? Well, to the extent the board has made that determination, the only other time it has done so that I'm aware of where it was reviewed by a court was in the Seventh Circuit's Explicitly and unambiguously rejected that position. It said it is wrong to interpret the statute as treating it as per se unlawful to grant benefits to some employees and deny them service. And I think it's particularly important that part of the reason that's problematic is because that is what the board itself has instructed employers to do. If you look at the Noah's New York Bagels case, that's a case that involves some employees getting benefits and others not getting it. And the board said not only that it was lawful to proceed that way, but that it was the prudent course of conduct, and then announced the rule that an employer should not put into effect any increase not already decided upon before the union came on the scene. And that's in the context of giving to some and not to others, and there is no discussion of a safe harbor in that case. It is just announced as the rule. You're talking about it as a per se rule, but is a presumption the same as a per se rule? Absolutely not. And so we don't dispute that there are some circumstances in which it might be rational to draw a presumption, but those circumstances, as courts have said for decades, are only circumstances in which the employer changes the status quo. So for instance, if there was an annual wage increase that always came due and they said this year we're not going to give it to you, and it was because there was a union on the scene, conversely, the exchange part situation of granting out of nowhere a brand new benefit that is a one-time thing that had never been discussed until the union appeared. Perhaps in those circumstances, it does make sense to infer some sort of improper motive, although I would say that the employer gets... Why isn't this somewhat like that last category? I mean, this, you know, they could have waited, they gave this a few days before the election. They're becoming very suspect here. Well, that is not the actual theory on which the ALJ and the board decided this case. It was not the theory that there was something wrong with actually granting the benefits increase. It was only the theory that it was problematic because of, I mean, to take the board's final pages of its briefs say quite clearly before this court that it believes it's per se unlawful to have given to some and not others. So that's exactly why they didn't think that they needed to demonstrate that there was any sort of improper motive or anything like that. Although I would note that the board, while not pushing this issue, does suggest below that we couldn't even give the increase as to the other employees, which I think just goes to show how much employers really are put in an impossible position here. Because we're told, you know, oh, you should have realized, you should go ahead and do this. While the board at the same time, its general counsel is arguing below, hey, it's really suspect that you gave these to anybody. I don't really know how an employer at that point figures out what they are supposed to be doing. Because whatever they do, there's going to be an unfair labor practice charge. And as long as the board is allowed to keep applying a presumption of illegality, even when it's granting or withholding, it just creates a situation. Is there presumption? I didn't read the briefing as asserting a presumption on the part of the NLRB. Well, I take their brief before this court to simply assert a per se rule. But I think that if you try... Which makes the safe harbor a sword, if you will. Yes, in a sense. A safe harbor is there as an exception that you can use. Right. But there's really nothing in jurisprudence that says, oh, you have to do it. And if you don't avail yourself of the safe harbor... That's right. And I think that that's actually true when you look at some of the board's own cases here. There are cases where they've said the employer didn't violate the law because they followed this course of conduct. But we have nothing in the NLRB jurisprudence that says when someone, when an employer does not do this, then we will say it is a per se. You could not do this other than if you had an improper motive. I think that's exactly right. And to go even a step beyond that, we actually have jurisprudence from the board saying that it was okay when the employer didn't follow the safe harbor. So they have specifically, you know, blessed employers doing what we did here. And there's really no meaningful difference between what they said was the prudent course of conduct in the Noah's New York Bagels case and what we did here, which is why we said below, we don't understand how you can tell us not to change the status quo and then turn around and tell us that we violated the law by not changing the status quo. Do you disagree with the proposition that the board does have the authority and discretion under the Act to impose this type of presumption as to certain conduct it believes is inherently destructive of employee rights? I believe that the board has the authority to adopt presumptions that are consistent with the facts that can be inferred from the facts in the record, which is why we wouldn't take issue so much with a presumption that was limited to circumstances where the status quo is changed. Because those circumstances, there's at least some basis for saying it sure looks like you responded to the union by doing something that was advantageous or disadvantageous to employees. We do not think, and this is, we're not alone in this. The prefill packaging case, the Ninth Circuit actually said it is not rational to infer improper motive in a circumstance where the employee is simply trying to preserve the status quo as the board has told it to do so. Because in those circumstances, more likely than not, the employer is doing what we did here, which is a good faith effort to comply with the board's own jurisprudence. Well, on the face of it, there's discriminatory treatment on the basis of whether someone is involved in the union election or not. Why isn't that sufficient to raise the presumption? I think the problem here, I mean, I will agree with you that it looks a little odd that that is what employers are now put in a position of doing. But they're put in that position because the board put them there. It has told them that is what they should do. So at that point, the board can hardly turn around and rely on the fact that it put these employers in this difficult position and then say, we infer from the fact that you're trying to comply with our law that you're actually doing something improper. So, you know, the board has to be clear to employers about what they can and can't do here if it wants to infer from what they do and don't do that they're actually trying to influence the election rather than do their best job to make sense of all of this conflicting guidance that they're getting. In Great Dane, the court said that all the board needs to do to shift the burden to the employer is to show that the employer engaged in discriminatory conduct, which could have adversely affected employee rights to some extent. That seems like a fairly low threshold to shift the burden. At that point, in essence, creating a presumption. To the extent the burden is shifted here, I mean, we also would submit that we met our burden. That's what my question was going to be. Assuming the burden shifts, which is the effect of any presumption, you have a burden to meet there. Yes, and the facts here are stipulated that what we said to employers, to the employees, first off, we didn't announce this to them at all in compliance with the notion that we shouldn't bring it to their intention, the union-eligible employees. So the letters were distributed in an envelope to the employees who were getting the raise, and that letter was not given to the ones who weren't as the benefits increased. Word was going to get out. I'm sorry? Word was going to get out. And when it did, the employer responded by saying, I'm sorry, we can't discuss this with you right now because we're not allowed to as a matter of law. And that's it. That's all they said, which is consistent with the law. It would have been inconsistent with the law for them to actually go on and say, but we promise we're going to give you this benefit even though we may not actually be able to do so because the law might prohibit us from doing so. So I think the fact that it is stipulated that our responses were simply, we're sorry, we can't negotiate your contract because you're in the critical period right now, is in and of itself sufficient to rebut any presumption that might apply here, although we certainly don't think there's a rational basis for even having a presumption or an inference on these facts in the first place. It seems to me that a company not giving it to those employees might make the employees more mad at the company rather than thinking it was going to be favorable. I do think there's an issue here that the safe harbor itself kind of shows the problem with this whole morass of law here because telling them, oh, you'd get a raise today, but you're not going to get it for two weeks because there's a union election, and then suggesting that somehow they're not going to tie those two things together. There's a lot of problems with all of this. So you suggest we just go back to plain old intent and purpose and somebody better show it. I think the best way to deal with this is to say you need motive, and to the extent you want to infer motive, you can only do it where there was a change in the status quo. That's the closest we can come to coming up with a change in the status quo. A change in the status quo in the sense that the benefits that were being received before the union came on the scene are no longer the benefits that are being received after the union came on the scene. So here there was clearly a change. If we had gone ahead with the increase, it would have changed the status quo as to what benefits employers. How can you ignore the potential impact on an election or the message you might send to employees when benefits are granted to everyone else? I mean, isn't a change in status quo on its face suggests certainly the potential to influence an election? And if the board hadn't repeatedly told employers, and courts hadn't repeatedly told employers, you can't change the status quo even in the context where you're changing it for non-election eligible employees. Perhaps this would be a different case, but we have decades of case law in which courts go out of their way. The orders from the board that don't get enforced are ones where the board fails to abide by this status quo distinction and does so even in context. In the Kerwood case in the Seventh Circuit, that's a case where it was some getting it and others not. And the Seventh Circuit said, that's not enough. You have to have intent. Doesn't that overstate the law a bit? I mean, if you had gone ahead and granted an increase across the board, you would have needed to put forward a reasonable business justification for doing that. Yes. But that itself also would have been an out from liability. Well, except for the fact that the board has already suggested that it also didn't think we had a reasonable business justification for going ahead with this. So the board itself, in this very case, is talking out both sides of its mouth, saying on the one hand, you know, this was a system-wide thing, so obviously you could do it, while arguing through its general counsel back before the board, hey, all of this looks really suspect since it was the week before an election. So, you know, if the board, the ultimate problem here, it's really just the same problem that was recognized shortly after exchange price by the Second Circuit in the Dorings case. The board can't say that the same conduct is both inherently illegal to go forward or not go forward with the very same increase. Can you help us reason through, in Great Dane and Brown, we seem to get two messages. One is there's a burden shifting where on a fairly minimal showing, the burden shifts to the employer to put forward some justification, and the board presumably can weigh that and make a decision about whether it thinks that that type of presumption is rebutted. But then the court has also gone on to say that where there is this category of cases that is inherently destructive of employee rights, the board, in effect, need not credit the explanation put forward by the board. And regardless of what the employer put forward, the inference of discriminatory animus can stand. Doesn't the latter seem like a per se rule? What's really the difference between the presumption that's rebuttable and the second category? I do think that Brown and Great Dane contemplate the idea of there being a narrow category of conduct that is per se unlawful. The problem is none of this conduct is because the board itself has long taken the view that in every circumstance of granting or withholding, it matters if the employer can come forward with legitimate business justification. That is itself a concession that the conduct is not per se unlawful, which makes sense because employers have to make determinations about benefits, and they have to do so even when unions are on the scene. So it's just not the kind of conduct that you can treat as necessarily inherently per se unlawful. It is at most conduct that in some circumstances might create the kind of presumption that's discussed in those cases, but presumptions have to be rebuttable, and presumptions have to be consistent with the facts and the inferences that can be drawn from the facts. So where was the burden here? You would say the burden was on the NLRB. Yes. Or the ALJ to produce evidence of intact intent, improper intent. That's right. And, again, I think the Free Poll Packaging piece is the most helpful one on this because the Ninth Circuit says there they can infer when the status quo has been changed, but when it hasn't been changed it's irrational to infer improper intent, and thus in that category of cases it is the board's obligation to actually prove intent, not simply infer it from the facts. Which case is that? It's Free Flow Packaging. It's a Ninth Circuit case. You've cited it a number of times in our briefs. I didn't hear you. All right. Thank you. Thank you. Thank you. May it please the Court, Jared Cantor on behalf of the National Labor Relations Board. I will abandon some of my prepared remarks and go right into some of the cases that my sister at the bar has been discussing with Your Honors. With regards to Noah's New York, it's important to note that there were two benefits at issue in that case. So it's important to, when reading that, understand that you have to look at that there were two things going on in that case, and I just want to make those clear. The board in that case found that there was no unfair labor practice where a benefit was withheld because in that case the employer successfully utilized the safe harbor, and second, that there was no unfair labor practice where a second benefit was withheld because what the board found there was that the decision to make that benefit was so premature. Essentially, there was no guarantee that that benefit was going to be announced. The employer was thinking about it. They were maybe going to do it, and then at the last minute they said, well, the election's coming, we're just not going to go ahead with it, and the board found there that that was not an unfair labor practice because no benefit was withheld. It was not even determined yet what the benefit was going to be, what the contours of that were going to be. Let me ask, why did the board not need to inquire into the intent and purpose, and why did the ALJ just say, oh, you didn't avail yourself of the safe harbor, so you lose? Well, Your Honor, two points. First, it's the board's position that there is a finding as to the employer's motivation here. How so? I want to make sure I give the pin-side. It's on page 11 of the decision in order, and I want to make sure I have... The ALJs. Yes, of the entire combined. It's page 11 of the combined DNO, and I believe that would be appendix 28 is the corresponding page. And part of what might make this case a little bit different is that, to my knowledge, this is the only one that proceeded on a stipulation, and so in the normal course of things this might have been a case where there was a withholding, and then in the myriad of cases cited between both sides, you then have testimonies to what we were going to grant it, why we didn't grant it, and there would have been much more there that would have required credibility determinations and very specific fact-finding. Here it proceeded on a stipulation, for reasons that I was not party to, where the stipulation... You gave a site, A28, where is it in the JA? Do you want to... Oh, has the original... Looking at JA28, where is there a finding of animus? Where is there a finding of purpose? There's a recognition as an objective fact that there is a distinction being made between those involved in the union and those who are not, but that that alone, as I read this decision, is what is triggering the finding of the unfair labor practice. Well, I want to make sure I answer both of Your Honor's questions. No, answer Judge Krauss. So I'll go to Judge Krauss first. The board here, consistent with its decisions, is looking at what is the employer's motivation, because, again, the foundational principle here is that an employer should not change their conduct, whether granting or withholding a benefit, just because the union is there, and one can imagine a withholding case that might not have to do with the union. It could be an employer... But that can't be the rule, because even the safe harbor anticipates a recognition that there is different treatment because the union is on the scene. And specifically, benefits are being given, so it has to be that that's permissible. Well, Your Honor, that's why... And not inherently coercive. I mean, a safe harbor doesn't seem to be much of a safe harbor at all when you come right down to it. But where is there a finding on purpose and motive? I apologize, Your Honor. I have the decision in order as the combined document in front of me. I don't have the ALJ decision separately in front of me. So the decision in order, which is the combined document on page A28 of the appendix... We're looking at that with you. That says, the evidence establishes the company took the action it did toward certain employees because they were not involved in a representation campaign and failed to take action toward others of its employees, specifically because they were involved in such a campaign. That's just a description of what has actually gone on. Where is there a finding of purpose? Well, Your Honor, in this case, the board posits that that is its finding of motivation, that it's consistent, again, with the guiding principle that the company should not take any action just because the union is on the scene, that it should continue as it would have anyways. But wait a minute. But the safe harbor, you know, would allow it to... But how does that convert into, okay, if you don't avail yourself of the safe harbor, you are per se improperly motivated? That's what the ALJ essentially found. Well, Your Honor, by not even availing themselves of the safe harbor, we're not at the situation that they tried to and somehow failed in doing so. They, in fact... Then you're making the safe harbor a mandatory way of dealing with this situation? The only way that someone can deal with this situation. That's what the ALJ found, basically. No, Your Honor. In a withholding situation, the board has put the safe harbor out there as something that an employer could do. Could do. But here the ALJ mandated that that's how they do it, instead of saying, oh, they did something other than the safe harbor. So we need to look at intent and purpose. Well, Your Honor, here the safe harbor is particularly relevant because in, let's imagine a hypothetical situation where a company was going to grant this benefit, but then they take a, there's an economic collapse or something, and they then want to withhold the benefit for this other reason, they would come forward with that reason. Here the company's reason for withholding the benefit was because these people, these union employees were about to vote in the election. No, they provided an explanation that they acted in good faith because they were trying to comply with inconsistent precedent of the board and understood that this action that is failing to take, leaving the status quo in place, not taking any further action, not making an announcement to the employees, and when asked questions saying we can't address that, we can't take any action now, indicating in its terms that they're legally obliged not to act at that point, that that was a reasonable business justification. Well, Your Honors, we cite in our brief courts that reject that this board law is inconsistent, is muddled, doesn't make sense, doesn't hang together. But is there any analysis below by either the ALJ or the board that goes through the consideration of any burden shifting, of the presumption coming into force, of the explanation that's given to conclude that there was a discriminatory purpose that motivated the employer here? Well, I think, Your Honor, in addition, again, to the admitted motivation for not granting this, which is an unlawful motivation to deny this benefit just to these union... But its motivation was because there was, it wasn't to encourage or discourage, and it wasn't discriminate, it was so as to try to comport with the law. Well, I think the cases cited by the court in its questions submitted to both counsel talks about, and the board admittedly does not use this inherently destructive analysis here, but it informs it that there is certain conduct that, by its nature, is foreseeable that there will be this course of a destructive effect. And... Where is their finding that that's what we have here? Where has the board ever said that this type of conduct falls into that category, so employers are aware of that? Your Honor, I would point to, it certainly does not go through that analysis in this case, but if we look at some of the board's earlier cases off the top of my head, I believe that that comes up in the board's Pennsylvania gas and water case, where there are some board decisions on this topic where it does go into much more depth, again, possibly because of the facts of the case, talking about why withholding a benefit can be so destructive before an election. And that makes sense. If an exchange parts were concerned about a grant of benefits, the fist inside the velvet glove right before the election, here there's no velvet glove. All that's left is the fist. All that employees are going to reasonably understand from this is a benefit is being withheld from them, and three years later continues to be withheld from them because they elected to exercise their Section 7 rights to petition and to vote in a representation election. This case, Pennsylvania gas and water, I mean, you better supply it, because I really think your response should be that there has been no finding by the board that this type of conduct is inherently destructive. Isn't that correct? Well, again, Your Honor, the board doesn't use inherently destructive. It talks about that it's reasonably foreseeable from a withholding or from a grant right around the time of election that that will have – Well, reasonably foreseeable is not the same thing as motive and purpose. I mean, it's reasonably foreseeable. Something can follow from another, but that doesn't mean that there's an intent or purpose. It's a difference between a discriminatory intent, an animus, and a sort of disparate impact. And the rationale that's described here seems like it's purely just an objective description of the impact. Just going back to fundamentals, does the board agree that conduct is only unlawful under both Sections 8A1 and 8A3 if the employer has acted with a discriminatory animus, with a motive, a purpose, to impact the election? Your Honor, under 8A3 of the Act, yes, an employer's motivation is relevant. Is relevant or is required for an unlawful discharge? It is required, yes. It's part of the board's analysis, and an example would be an unlawful discharge. And how about 8A1? In an 8A1 situation, within the context of benefit grants, yes, consistent with exchange parts, but as the second half of both briefs I've outlined, in an interrogation instance, that's a violation of 8A1, but the employer's motivation is not relevant. Well, that's different. Yes. So under all circumstances... But the benefit issues, it's correct, it's required, is it not? Yes. And where was there a finding here? Wasn't it up to the ALJ to develop a record as to that? In so many cases, there are findings that something was improper motive, improper purpose. Here we have no reference to it at all by the ALJ. Well, here, Your Honor, other than the language that I have pointed the court to, that's the language that we're relying on. And again, because the parties proceeded from a stipulation here, the ALJ relied on that stipulation with the center admitting that it's reason, it's motivation for withholding this benefit, although they're claiming that it was for because they can't understand the case law, it makes no sense, although then they didn't try to utilize the safe harbor. Okay, so you're talking about some credibility issues here so that someone can make a finding, but nobody did. Well, Your Honor, testimony as to the benefit increase was very, very limited. It primarily consisted of the parties stipulating on that issue. The ALJ begins its analysis with the parties' stipulation as to all the facts involved. Well, whose burden was it to put forth evidence? Whose burden was it to put forth evidence? The general counsel's, Your Honor. Okay, and what evidence was adduced as the improper motive? Nothing. It was the stipulation, but the other side admitting that the reason it withheld this benefit was because It was because there was an election, not to discourage or affect the election, but because there was an election. It's not the same thing. Well, Your Honor, that is part of the presumption that That's the first time you have used that word. Never is it in your brief, is it? No, Your Honor, the word presumption does appear in our brief. Is it the Board's position that the actions that were taken here by the employer fall in that category of conduct so inherently destructive of employee rights that the Great Dane type of presumption comes into play? That is, that the employer's motive could simply be rejected by the Board? Yes, Your Honor. Again, the Board does not use that Great Dane buzzword language in this type of analysis, but with the company admitting that the reason it didn't grant the benefit to the unit employees was because they were voting. So proceeding from that essential admittance as to why it was not being granted. And then in addition to that, the general presumption that during this time that we are extra sensitive to anything that might be upsetting the status quo or influencing the election one way or the other, and that is it can be timing or it can be other statements made. And in addition here, then, the fact that there is this well-known safe harbor that was then not utilized and in fact statements were made that would have contradicted any attempt to lawfully withhold this benefit. But a safe harbor is not a sword. A safe harbor is not something that you, if you don't avail yourself of, you're in trouble. Am I correct? No, Your Honor. A safe harbor is indeed a safe harbor. It's a shield for the employer. Where do you argue that there is a presumption here in your brief? I'm not seeing it. If I had the word document, I would do a quick search of the word presumption, Your Honor. Okay. I believe it comes up in our... I mean, you don't really make the argument that there is a presumption that shifts the burden, do you? That shifts the burden to the employer? Well, no. I mean, that's inherent in all of the case law that's here, Your Honor. But the company didn't here try to argue that it satisfied a burden here. It admitted that it withheld the benefit because of... But you're assuming that the burden was on them. I'm saying if there is no presumption, is it really up to the employer? That's only if it's so inherently destructive. Yes, Your Honor, which... Which you think it is. Yes, Your Honor, which I think between all of the cases cited by both parties, it is certainly in the case law. Can you help us untangle... There's the burden shifting, but then there's this other thing that's described by the court that beyond simply presumption associated with burden shifting seems like a conclusive presumption. How can we say that on the one hand, purpose and motive is required on the face of the statute? It's unambiguous. And on the other hand, that with a showing that certain conduct has taken place, that that burden shifting is conclusive, that regardless of what the employer puts forward, that the board is free to simply ignore it. Well, I don't think the board ignored what the employer put forward here. The employer put forward a stipulation as to why it withheld the benefit. But the ALJ ignored anything having to do with motive. The ALJ said you didn't use the safe harbor. It was unlawful. Well, that's after the finding that essentially they were unlawfully motivated here, Your Honors. That's the cart before the horse, isn't it? I would point, so again, this is page 11 of the DNO, of the combined decision and order, Appendix 28, where after the ALJ, it's near the end of the long paragraph starting, did the company violate the act, and then the ALJ reasons, the evidence established that the company took the action it did. That's the language that we read earlier. Yes, Your Honor. And toward the end of that page, the board goes on to even talk about discriminatory impact. But you've agreed, even the board acknowledges that purpose is required, not just impact. Yes, Your Honor, unlawful motivation. And deciding a benefit decision along protected lines is unlawful motivation. All right, thank you. On the question of the interrogation and surveillance of employees, just a couple of questions for you there. Your Honor, you seem to be arguing that appellants can't raise a free speech challenge. But aren't there arguments really about how we go about construing the statute and how whether the board's construction and application is constitutional? Isn't that different than raising a First Amendment claim? It's ensuring that the construction we undertake is within constitutional parameters. Is it your position that that's we? That we should go about a statutory construction analysis without accounting for constitutional boundaries? No, Your Honor, that's not the Tenney argument that the board was making. I mean, the board will... Analysis of 881 violations in the context of interrogation or surveillance, the balancing that exists that the board undertakes is that an employer's speech or conduct is a violation in those instances only if it coerces, restrains, or interferes with employee Section 7 rights. And that's the balance that this Court in Allegheny mentioned, and I believe also the Supreme Court in Gissel, where that's how the First Amendment and employer's 8C rights are squared. So, no, Your Honor, we're not somehow implying that the court cannot... In looking at what the board did here, it's looking for, essentially, was there coercion or was there interference or restraint? And that's what makes the board's unfair labor practice findings square with the argument that I believe Your Honor was just positing, that the court somehow couldn't get to look at those just because their specific free speech and First Amendment claims are Tenneyed. And on the surveillance issue involving Jimenez, we have these statements from the board seeming to declare certain factors as immaterial. To the extent that suggests that the board is saying as a matter of law those things are not factored into its analysis, wouldn't we need to remand for those to be properly taken into account? If the court felt so inclined, then yes, but I believe what the board was discussing there was that they were immaterial in the sense that they would not outweigh the finding of coercion. And that's similar to Duggar as well, where they make the claim that certain elements of the board simply found inapplicable. The board in that footnote addressing the dissenting member is just saying that having found coercion here, it's immaterial. It will not reverse that finding just because an interrogation or a surveillance episode might have been, you know, there was no raised voices, it was civil. But this was an impression of unlawful surveillance, not of coercion. Well, yes, Your Honor, but an impression of unlawful surveillance, once again as any 8A1 violation hinges on, that it restrains, coerces, or interferes with an employee's Section 7 rights. And an impression of surveillance, well, because it would, if it reasonably leads an employee to believe that their activities are being monitored. Finally, let me ask, you analogize this to the statements in Golden Steve Doering, but there, when the board is undertaking its analysis, it seems to indicate their significance to the fact that if the employees didn't otherwise know that there would be, there was surreptitious surveillance, and that bringing to their attention that there had been surveillance would suggest that there was going to be future surveillance of union-related activities and possible consequences to them. Here, given Jimenez being very outspoken, and this conversation even taking place because of him being quoted in newspaper articles, how do we have those same concerns? How does it create an impression of unlawful surveillance for there to be communication back to Jimenez about the reaction to his statements in the newspaper? Well, Your Honor, it's two parts. It's Guerrero talking about what happened at the management meeting and management's response, its reaction or overreaction to him being in the newspaper, combined then with Guerrero's warnings to him about watching his back, to tone it down, to come to work and to go home, and that combined that those would reasonably tend to coerce, restrain, or interfere with an employee's Section 7 rights because they would lead that employee to believe that now he's in a special focus, that he's pinpricked the employer somehow, and that they're going to be paying extra special attention to him, which is very different than the case of if Guerrero had, or a supervisor just acknowledged to an employee, oh, I saw you were quoted in the newspaper. This is his friend. This isn't his supervisor, right? Well, Guerrero described them as being friendly, Your Honor. I don't know if, I don't think the evidence establishes that they were. It's not his supervisor, and Guerrero didn't even initiate the conversation. This isn't coming to him as a message from his supervisor or from management, is it? No, and it does not have to, Your Honor, although the second incident which starts out with Guerrero initiating it by saying, oh, it's the golden boy, and then walking into his office, and obviously immediately, and then has followed him based on that remark. Okay. If there are no further questions. All right. Thank you. Ms. Murphy, rebuttal. First, let me ask a question relating to the interrogation. We haven't discussed the burn factors in any opinion of ours. Do you agree that they're relevant? I think they're relevant. I mean, I think it makes sense that the right way to answer these questions is to look at the context, the types of questions that were asked, the information that was sought. So, you know, we're not disputing that. Our core contention on all of this is simply that if you look at what the ALJ and the Board said here, it's pretty clear that they thought it was per se unlawful to ask an employer, employee whether or why they support the union. And there's two things I would point the Court to in particular. One is on page 12 of the JA, the discussion about the conversation between Monica and Jimenez when the ALJ says, you know, they crossed the line by asking these additional questions of why do you support the union. All the other questions were fine, but he crossed the line when he said why do you support the union. And then the other thing is the actual order that the Board is asking you to enforce here, which instructs my clients to cease and desist interrogating employees about their views on the union, not coercively interrogating them, not asking them questions in a manner that contains implicit or explicit threats or anything like that, but just interrogating. In other words, it orders us to cease and desist from asking employees anything about their views on the union. I don't see how you square that with the First Amendment or Section 8A1 here. Was that in your brief? Did you make that point in your brief? I'm not sure we made that point in terms. It was something I noticed when I looked back at the order the other day. But, you know, it's certainly consistent with the basic argument we're making, which is it's very difficult to square any of this with the First Amendment, which necessarily is not a distinct claim but, as you know, just something courts need to take into consideration when determining whether speech is unlawful. How do you distinguish Golden Steve Doering? I think that that case is different for the reasons that you were suggesting in that it's not an instance where it would have been perfectly logical to the employee that, of course, people knew what he was doing because he was doing it so publicly. And the other thing here is when you look in context at the testimony on this issue before, I mean, what Guerrero says, and he wasn't found not credible, is I wasn't, A, I wasn't conveying any message from management, but I wasn't even only talking about, you know, that he might upset managers. I was just telling him, you're kind of irritating people because you're being really, really aggressive about this, which is consistent with Jimenez's own testimony that in the hall he just struck up a conversation with Guerrero about everything management was doing wrong and why they needed a union. So this is just, you know, two coworkers, and it's not his direct supervisor. It's one just saying to him, hey, in my view, it might not be a bad idea for you to tone it down a little bit. But you have a substantial evidence standard here, which is very tough. Would you not agree? I don't. I mean, I don't think on this record that there is substantial evidence. That no reasonable juror could find? I don't think that looking at these statements and the facts that the ALJ talked about, that it is enough to create an actual problem of coercion or surveillance. And I think that that's partly because we are talking about speech and the First Amendment and as the Supreme Court has cautioned, you know, you have to read these terms in this statute consistently with that. Is it your position that these fall within the pronouncements of ground? Yes, non-coercive questions, which as this Court said, you know, if you can't ask non-coercive questions, 8A1 would collide directly with the First Amendment. And I don't think that in this context, these very brief conversations where things were said like, do you support the union? Yes, the end. That is in and of itself, you know, a coercive interrogation. We asked you in our letter of January 13th to address the specificity needed in an employer's arguments to the board to satisfy TANI's jurisdictional bar in light of FES. Can you address that? Yes, as to this issue, I don't, I will not dispute that we didn't talk about the First Amendment below. I don't think that that is a problem from a TANI perspective. But isn't it directly an 8C issue? It is an 8C issue, but, you know, I mean, I think exactly, and as the Supreme Court has said, in interpreting 8A1 and 8AC, basically nothing violates the one that isn't protected by the other and vice versa. So it doesn't really ultimately matter if you think about this as an 8A1 case, an 8C case, or a First Amendment case because all three of them reflect the same principle of this is speech and the act itself, in particular if you look at the Chamber of Commerce versus Brown decision where the court said that Congress field preempted regulation of speech here because it felt so strongly that it was important that both sides be able to speak. So I think, you know, that all just has to be taken into consideration in any 8A1 case, whether or not we specifically mentioned the First Amendment before the board. All right. Thank you very much. Cases well argued. Thank you. Take it under advisement. I ask the court to recess.